**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**CHRIS P. FRAZIER**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

LOUIS AMALFITANO,                          )
                                           )
    Appellant-Defendant,               )
                                           )
        vs.                      )          No. 48A04-1108-CR-446
                                           )
STATE OF INDIANA,                          )
                                           )
    Appellee-Plaintiff.                )

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable Rudolph R. Pyle, III, Judge
Cause No. 48C01-1006-FB-199

**April 30, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

Louis Amalfitano ("Amalfitano") was convicted of Criminal Confinement, as a Class B felony[1]; Battery Resulting in Serious Bodily Injury, as a Class C felony[2]; Exploitation of an Endangered Adult, as a Class D felony[3]; Financial Exploitation of an Endangered Adult, as a Class D felony[4]; two counts of Theft, as Class D felonies[5]; Obtaining a Controlled Substance by Fraud, as a Class D felony[6]; and Possession of a Controlled Substance, as a Class D felony[7]. He now appeals.

We affirm.

## Issues

Amalfitano raises two issues for our review, which we reframe as:

I.   Whether the trial court abused its discretion when it denied his motion to strike certain evidence, thereby violating his confrontation rights; and

II.   Whether his sentence is inappropriate under Appellate Rule 7(B).

## Facts and Procedural History

In August 2009, Amalfitano moved to Anderson with his family, including his father, Luigi; his brothers, E.A. and V.A.; his fiancée, Stephanie Cole ("Cole"); and his daughter with Cole. In October 2009, A.T., then sixty-five, lived across the street from the Amalfitano

---

[1] Ind. Code §§ 35-42-3-3(a)(1) & (b)(2)(B).
[2] I.C. § 35-42-2-1(a)(3).
[3] I.C. §§ 35-46-1-12(a)(1) & (b)(2).
[4] I.C. §§ 35-46-1-12(c) & (d).
[5] I.C. § 35-43-4-2(a).
[6] I.C. § 35-48-4-14(c).
[7] I.C. § 35-48-4-7.

family and intervened in a fight involving E.A. The Amalfitano family befriended A.T. and learned that A.T. was having financial difficulties, and was thus unable to continue living in her apartment. The Amalfitanos allowed A.T. to move into their home, and V.A. gave up his bedroom to A.T.

In early November 2009, the Amalfitano family decided to move to New York City, where many of their relatives lived. A.T. accompanied them, and the group used A.T.'s minivan for transportation to New York City and lived in the van for a time. In January 2010, the Amalfitano family returned to Anderson. A.T. also returned to Anderson and remained with the Amalfitanos.

After spending a few nights with some of Cole's family members and in a hotel, the family, together with A.T., moved to an apartment on 21st Street in Anderson. At this time, Amalfitano and his brother, E.A., began to throw hot and cold water on A.T. On one occasion, Amalfitano threw a butter knife at A.T.; the knife struck the back of A.T.'s head and caused profuse bleeding. A.T. did not obtain professional medical care for this injury. A.T. was confined to the apartment, and felt as if she had lost her freedom when she moved there with the Amalfitanos.

Sometime in April 2010, the Amalfitanos moved to a house on Fletcher Street in Anderson. Once there, Amalfitano confined A.T. to an unventilated utility room for twenty-two or twenty-three hours per day. The windows of the room were boarded up, and the curtains had been drilled into the walls so they could not be raised. A door from the room to the exterior of the home was padlocked so that it could not be opened. A hook on the interior

of the house secured the only other door in the utility room, which led to the kitchen inside the home.

A.T. could not leave the utility room for the interior or exterior of the home unless one of the other occupants permitted her to leave. She was forced to beg to be let out of the room for any purpose. Unless Amalfitano or another resident of the house permitted A.T. out of the utility room, A.T. would be forced to urinate and defecate into a plastic grocery bag that was hanging from the doorknob of the padlocked exterior door. Throughout this period, A.T. was rarely given food and never received enough to eat.

At some point, a mattress was placed in the room; Amalfitano and his brother, E.A., would soak the mattress so that A.T. had no dry place to sleep. In addition, Amalfitano and E.A. physically abused A.T. on multiple occasions, which resulted in numerous rib fractures, bruises, abrasions, and other injuries. A.T. did not receive medical care for these injuries.

In addition, from around the time A.T. began to live with the Amalfitanos, A.T. was deprived of access to the proceeds of her Social Security benefits checks. Though at first A.T. willingly gave up the funds to help the family move to New York, she was soon compelled to surrender the money. Amalfitano and his father, Luigi, took the funds from A.T.'s Social Security checks and used the money for their own purposes. Amalfitano and Luigi also took control of A.T.'s prescriptions for Xanax and Hydrocodone, preventing A.T. from having access to these medications.

While the Amalfitanos were living on 21st Street, they met Barbara Shannon ("Shannon") and Carlos Hood ("Hood"). Shannon and Hood befriended Amalfitano and

4

Cole, and observed some of Amalfitano's harsh treatment of A.T. After Shannon inquired about A.T.'s well being and seeking to remove A.T. from the home, Amalfitano told Shannon that she could not take A.T. from the residence. Soon afterward, the Amalfitanos left the apartment on 21st Street and moved to the house on Fletcher Street.

Shannon and Hood were visiting friends on Fletcher Street when they encountered Amalfitano and visited the Amalfitano family on several occasions. Shannon inquired about A.T. twice; each time, Amalfitano told her that A.T. was upstairs. Shannon did not believe this story because she knew A.T. had difficulty walking, and on one occasion saw a door locked from the inside of the house. Suspecting that A.T. was being kept in a room behind the latched door, with Hood's encouragement Shannon contacted Adult Protective Services ("APS"). APS in turn contacted the Anderson Police Department.

On May 27, 2010, Officers Freddie Tevis ("Officer Tevis"), Jim Rhodes ("Officer Rhodes"), and Ian Spearman ("Officer Spearman") of the Anderson Police Department arrived at the Amalfitanos' home to check on A.T.'s welfare. Luigi was at home with Amalfitano's daughter and answered the door. Officer Tevis asked Luigi about A.T. After giving contradictory explanations of A.T.'s whereabouts and becoming increasingly nervous, Luigi eventually escorted Officers Tevis and Spearman on a tour through the house. Upon arriving in the kitchen, Officer Tevis asked to see into the room beyond the latched door into the utility room.

Luigi opened the door, and Officer Tevis saw A.T. sitting in a dark utility room. Because the room was unventilated and had no insulation, it was extremely hot and smelled

5

strongly of human waste. Upon helping A.T. exit the utility room, Officer Tevis observed that A.T. had numerous injuries, including a large bruise on her right arm resulting from Amalfitano grabbing and pulling her, and a bruise over her right eye. The bruise over A.T.'s eye was caused by Amalfitano punching A.T. only a day or two before, which also resulted in two fractures around A.T.'s right eye socket. A.T. was disoriented, weak, very frail, and under nourished.

Upon discovering A.T. in these conditions, police arrested Luigi. Amalfitano and Cole arrived at the house shortly after police arrested Luigi, and were also arrested. Upon arrest, Luigi had a bottle of pills belonging to A.T.; the pills were later determined to be Alprazolam, which is a controlled substance marketed under the brand name Xanax. A.T. was taken to St. John's Hospital in Anderson, where she was diagnosed with severe hypokalemia (potassium deficiency), dehydration, and malnourishment, which put her at severe risk of sudden cardiac arrest, kidney failure, and liver failure.

On June 3, 2010, Amalfitano was charged with Criminal Confinement; Battery Resulting in Serious Bodily Injury; Exploitation of an Endangered Adult; Financial Exploitation of an Endangered Adult; two counts of Theft; Obtaining Prescription by Fraud; and two counts of Possession of a Controlled Substance.

On June 28, 2011, a jury trial commenced, during which the State intended to call Cole, who was imprisoned pending trial in the Madison County Jail, as a witness. During the pendency of the trial, and after the trial court had sworn the jury and ordered the separation of witnesses, Cole called Amalfitano, who had been released on bail, by phone from the jail.

6

The two discussed plans for Cole to refuse to testify.

The State notified the trial court of Amalfitano's violation of the order for separation of witnesses, and in response the trial court revoked Amalfitano's bail. Cole was called to testify. After she refused to do so, the State extended use immunity to her and began its direct examination. Cole testified that she had written a letter to Amalfitano that police had obtained after a search of the house. In the letter, she referred to Amalfitano's abuse of A.T. The incriminating letter was admitted into evidence without objection, after which Cole refused to continue her testimony. Amalfitano briefly cross-examined Cole, who continued to refuse to offer testimony.

The trial court found her to be in criminal contempt of court. Amalfitano then moved the court to strike from evidence both Cole's testimony and the letter she had written to Amalfitano, arguing that to do otherwise would deprive him of his right to confront witnesses under the Sixth Amendment to the United States Constitution. The trial court denied Amalfitano's request.

On June 30, 2011, the jury found Amalfitano guilty of all charges except for a single count of Possession of a Controlled Substance. A sentencing hearing was conducted on August 1, 2011, at the conclusion of which the trial court entered judgment of conviction against Amalfitano and sentenced him to the statutory maximum terms for each offense, with each of the sentences run consecutively, for an aggregate sentence of forty-six years imprisonment.

This appeal ensued.

**Discussion and Decision**

Admission of Evidence

Amalfitano contends that the trial court abused its discretion when it admitted into evidence Cole's letter to him, which police found during a search of the Amalfitano residence on Fletcher Street. We review the admission of evidence for an abuse of discretion, which occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. Turner v. State, 953 N.E.2d 1039, 1045 (Ind. 2011). Even where the trial court has erred in admitting evidence, we will not reverse the conviction if the error does not affect the substantial rights of a party, that is, where the conviction "is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction." Id. at 1059.

An adverse party must make a contemporaneous objection to avoid waiver of an appeal on the admission of evidence. Jackson v. State, 735 N.E.2d 1146, 1152 (Ind. 2000). "A contemporaneous objection affords the trial court the opportunity to make a final ruling on the matter in the context in which the evidence is introduced." Id. Here, Amalfitano did not contemporaneously object to the admission of the letter upon its introduction into evidence. He instead moved to strike the letter and Cole's testimony after Cole refused to testify upon direct and cross-examination after the State extended her use immunity. Amalfitano thus waived appellate review of the admissibility of Cole's letter.

Waiver notwithstanding, we turn to the merits of his claim. Amalfitano argues that the admission of Cole's letter violated his rights under the Confrontation Clause of the Sixth

8

Amendment to the United States Constitution. Specifically, Amalfitano contends that admission of the letter violated the prohibition of the admission of out-of-court testimonial statements under Crawford and its progeny. See Crawford v. Washington, 541 U.S. 36 (2004).

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. This right is applicable to the states through the Fourteenth Amendment. Hape v. State, 903 N.E.2d 977, 988 (Ind. Ct. App. 2009) (citing Pointer v. Texas, 380 U.S. 400, 406 (1965); Howard v. State, 853 N.E.2d 461, 464 (Ind. 2006)), trans. denied.

In a series of cases, beginning with Crawford, the Supreme Court has held that the Sixth Amendment renders inadmissible out-of-court testimonial statements of a declarant unless "the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford, 541 U.S. at 59. This rule has as its governing concern the exclusion of the "civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused" that had been used in England and at various times in the American Colonies. Id. at 50. Animated by this concern, the Court has held that whether a statement is testimonial depends upon whether it had as its "primary purpose … creating an out-of-court substitute for trial testimony." Michigan v. Bryant, 562 U.S. ___, 131 S. Ct. 1143, 1155 (2011). Where a statement did not have such a primary purpose, its admissibility "is the concern of state and federal rules of evidence, not the Confrontation Clause." Id.

9

Whether an out-of-court statement is testimonial depends not upon the State's intention to introduce the statement for purposes of obtaining a conviction of the defendant at trial, but rather whether the statement was obtained as a substitute for trial testimony. Turner, 953 N.E.2d at 1055. In Davis v. Washington, the Supreme Court held that "not all those questioned by the police are witnesses and not all 'interrogations by law enforcement officers,' … are subject to the Confrontation Clause." Bryant, 131 S. Ct. at 1153 (quoting Crawford, 541 U.S. at 53; citing Davis v. Washington, 547 U.S. 813, 826 (2006)). Thus, the Court distinguished between statements made to procure emergency assistance from statements made when it was "'entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct.'" Id. at 1154 (quoting Davis, 547 U.S. at 829). A statement need not be formal to be testimonial, but "'formality or informality can shed light on whether a particular statement has a primary purpose of use at trial.'" Id. (quoting Bullcoming v. New Mexico, 564 U.S. ___, 131 S. Ct. 2705, 2721 (2011) (Sotomayor, J., concurring)).

Here, Amalfitano objected to the admission as a testimonial statement of an undated handwritten letter to him from Cole that police obtained during a search of Amalfitano's and Cole's bedroom in the Fletcher Street residence. That letter complained that, with the couple's anniversary near, Cole would "literally have to beg you to just want to sit in the same room as me" because Amalfitano "would rather keep treating an old woman like shit," "keep [A.T.] around and keep abusing her … for money," and force A.T. to sleep on the floor as "an everyday thing." (Ex. 33.) Cole further stated that "you have a 65yr old woman sleep

10

on the floor with no blanket no nothing…. You and your brothers really are gonna cause her to die." (Ex. 33.)

We find no error in the trial court's admission of the letter under the Confrontation Clause because the letter does not come within the framework of testimonial statements subject to exclusion. The letter clearly lacks formality, and, more crucially, its primary purpose was not to provide investigatory material to police. We decline Amalfitano's invitation to conclude that such out-of-court statements are testimonial simply because they are incriminating and obtained as the result of a search warrant.

Moreover, even if the letter had been testimonial and as a result inadmissible, any error was harmless in light of the substantial additional evidence of Amalfitano's guilt. A.T. testified that she did not receive her medications because Amalfitano took them, was locked into the room in the Fletcher Street residence, was beaten regularly by Amalfitano, and was forced to hand over the proceeds from her Social Security checks. V.A. testified that he was present when Amalfitano threw a butter knife at A.T. that struck her head, knew that A.T. was forced to remain in the utility room and had himself locked her in the room at least once. V.A. knew that A.T. was not given enough to eat and would give her food when he could, and characterized Amalfitano as "the boss of the house it's whatever he says goes [sic]." (Tr. 366.) Shannon and Hood testified that they personally observed some of Amalfitano's mistreatment of A.T., in particular his confinement of A.T., and saw Amalfitano flash money and prescription drugs that he would not have had as a result of his own or any other family member's income. Thus, even if Cole's letter had not been introduced into evidence, there

11

was sufficient independent evidence to sustain Amalfitano's convictions. Cf. Turner, 953 N.E.2d at 1059 (setting forth the standard of review for harmless error). He therefore was not prejudiced by any error.

Sentencing

Amalfitano further contends that his aggregate forty-six year sentence is inappropriate. Under Appellate Rule 7(B), this "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." It is the defendant's burden to persuade this court that his sentence "has met th[e] inappropriateness standard of review." Anglemyer v. State, 868 N.E.2d 482, 494 (Ind. 2007) (quoting Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006)), clarified on reh'g, 875 N.E.2d 218 (Ind. 2007).

In Reid v. State, the Indiana Supreme Court reiterated the standard by which our state appellate courts independently review criminal sentences:

> Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of a sentence through Indiana Appellate Rule 7(B), which provides that a court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender. The burden is on the defendant to persuade us that his sentence is inappropriate.

876 N.E.2d 1114, 1116 (Ind. 2007) (internal quotation and citations omitted).

The Court more recently stated that "sentencing is principally a discretionary function

12

in which the trial court's judgment should receive considerable deference." Cardwell v. State, 895 N.E.2d 1219, 1222 (Ind. 2008). Indiana's flexible sentencing scheme allows trial courts to tailor a sentence appropriate to the circumstances presented. See id. at 1224. One purpose of appellate review is to attempt to "leaven the outliers." Id. at 1225. "Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." Id. at 1224.

Amalfitano was found guilty of eight offenses: one Class B felony, with a sentencing range of six to twenty years imprisonment and an advisory term of ten years, I.C. § 35-50-2-5; one Class C felony, with a sentencing range of two to eight years imprisonment and an advisory term of four years, I.C. § 35-50-2-6(a); and six Class D felonies, each with a sentencing range of six months to three years imprisonment and an advisory term of eighteen months. I.C. § 35-50-2-7(a). The trial court found that Amalfitano's offenses were not a single episode of criminal conduct and therefore ran the sentences for each offense consecutively. See I.C. § 35-50-1-2(b) & (c) (defining an "episode of criminal conduct" and limiting the total of consecutive terms of imprisonment for an episode of criminal conduct to the advisory sentence for a felony one class higher than the most serious felony for which the defendant has been convicted). This yielded an aggregate sentence of forty-six years imprisonment, with none of that time suspended. Amalfitano now contends that his sentence is inappropriate, and points in part to his father's sentence, which is an aggregate of forty-six years, with thirty-four years executed and twelve years suspended to probation. Amalfitano

13

v. State, 956 N.E.2d 208, 211 (Ind. Ct. App. 2011), trans. denied.

With regard to Amalfitano's argument comparing his sentence to his father's sentence, we observe that Luigi pled guilty to the offenses and negotiated a plea agreement that the trial court in that case accepted. The trial court then "imposed the maximum sentence allowed under the plea agreement." Id. The trial court further explained the difference in sentencing by noting that Amalfitano was "the ring leader, not [Luigi], not [Cole] and neither your brother [sic]" based upon V.A.'s testimony at trial and A.T.'s testimony at the sentencing hearing, in which she identified Amalfitano as the individual most culpable for her abuse. (Tr. 642). And while Amalfitano claims that his prior juvenile adjudications for Battery were the result of his father's provocations, we will not second-guess a trial court's weighing of aggravating and mitigating factors that are not improper as a matter of law. Id. at 211 (citing Anglemyer, 868 N.E.2d at 490-91).

With respect to the nature of Amalfitano's offenses, we note that he engaged in a series of escalating abuse over the course of nearly six months, from November 2009 to May 2010. This conduct involved taking advantage of a position of trust with A.T., which gave him access to A.T.'s Social Security funds and her prescription medication, which Amalfitano used to feed his own addictions. Amalfitano forced A.T. to remain in conditions which may most charitably be described as unsanitary, with little access to a toilet, clothing, or food, so that A.T. was forced to beg to use a bathroom and would use a plastic grocery bag to urinate and defecate. Police officers who entered the room in which Amalfitano forced A.T. to live reported that they could only remain inside for a few seconds at a time because of

14

the overpowering smell of human waste. The room was also unventilated and significantly hotter than the rest of the house—so much so that one witness reported that his polo shirt and undershirt were both soaked with perspiration after only a few minutes in the room. The trial court observed in its sentencing statement, "[a]nimals don't treat other animals like that." (Tr. 645.)

When police finally rescued A.T., she had lost thirty-six pounds, which caused her weight to fall below a healthy level, and she suffered from severe hypokalemia and dehydration, putting her at severe risk of sudden cardiac arrest, kidney failure, and liver failure. A.T. required significant hospitalization and medical care to recover from these conditions. A.T.'s physical injuries from Amalfitano's battering involved numerous broken ribs and fractures to her right eye socket. A.T. was "close to death when they found her." (Tr. 646.) One police officer who had known A.T. for many years testified that A.T. was in such bad condition that he did not recognize her when he went to visit her in the hospital because of her injuries and "tremendous loss in weight." (Tr. 440.) These results go far beyond the pale of the offenses contemplated by the legislature in setting forth advisory sentences.

Nor does Amalfitano's character speak well of him. At sentencing, he sought to blame his upbringing for his actions. He has prior juvenile adjudications for resisting an officer, battery, fraud, and healthcare fraud. Amalfitano was addicted to several prescription drugs, and only sought treatment after he was arrested. Amalfitano's conduct during the trial further reflects badly upon him. Amalfitano had several telephone conversations with Cole

15

during the pendency of the trial that violated the court's order for separation of witnesses, in which the two discussed how Cole could avoid giving testimony and recognized that she could be held in contempt of court for any refusal to testify.

In light of all this, we conclude that the Amalfitano's aggregate forty-six year sentence is not inappropriate under Appellate Rule 7(B).

## Conclusion

Amalfitano waived his challenge to the admissibility of Cole's letter. Waiver notwithstanding, the letter was not testimonial and its admission did not constitute a violation of Amalfitano's Sixth Amendment right to confrontation, and any error that did arise from admission of the letter into evidence was harmless. Finally, his sentence is not inappropriate under Appellate Rule 7(B).

Affirmed.

ROBB, C.J., and MATHIAS, J., concur.